# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Omar Ruiz-Perez,<br><br>　　　　Defendant. | CR-11-0561-TUC-DCB-DTF<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is Defendant Ruiz-Perez's Motion to Suppress Evidence. (Doc. 36.) The government responded in opposition (Doc. 38) and Defendant Ruiz-Perez replied (Doc. 44). This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Defendant's motion came on for an evidentiary hearing on August 23, 2011 (Doc. 46). Defendant was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement. The government and Defendant Ruiz-Perez filed post-hearing supplemental memoranda, with the Court's permission. (Docs. 54, 59.)

Defendant's motion seeks to suppress evidence that he alleges was seized as the result of an improper stop, prolonged detention and a search that exceeded Defendant's consent. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Motion to Suppress.

# I.

# **FACTUAL FINDINGS**

On January 19, 2011, United States Border Patrol Agent (BPA) Tim Kouris was on duty at the Interstate Highway 19 (I-19) Immigration Checkpoint. (RT 16, 19-20.)[1] BPA Kouris was working as a canine handler in the pre-primary inspection area. (*Id.*) Defendant drove a semi-truck and trailer owned by MRM Express into the checkpoint. (RT 88.) At the time, the checkpoint traffic was being "flushed,"i.e., waived through without inspection to reduce the backlog. (RT 20, 32, 88.)

About three weeks earlier BPA Kouris had been advised of a general Immigration Customs Enforcement (ICE) look out for trucks belonging to MRM Express, a company ICE believed to be involved in drug trafficking. (RT 19.) As Defendant passed, BPA Kouris noticed the lettering for MRM Express on the truck and he recalled this lookout. (RT 21.) BPA Kouris signaled BPA Christopher Thornton to stop Defendant. (RT 19, 21, 32, 43.) BPA Thornton directed Defendant to stop and then walked back to talk with BPA Kouris. (RT 21, 32-33, 39, 44.) BPA Kouris told BPA Thornton about the ICE lookout and Thornton returned to the cab to do an inspection. (RT 21, 45.)

While walking back to the cab, BPA Thornton noticed the truck had a high Department of Transportation (DOT) number and "ghost lettering," i.e., decals and markings from the previous owner that can still be seen through new paint. (RT 39-40.) The high DOT number indicated to BPA Thornton that the truck was recently registered. According to BPA Thornton, he learned through training and experience that well established trucking companies have lower DOT numbers because their trailers have been around longer. (RT 36.) The high DOT number indicated a very new company or that the company was fake. (*Id.*) The "ghost lettering" indicated "a rush job," rather than the company seeking to project a

---

[1] "RT" refers to the Reporter's Transcript of the August 23, 2011 evidentiary hearing. (Doc. 60.) "Ex." refers to the exhibits admitted at that hearing. (Doc. 46.)

- 2 -

1    professional image. (RT 37.) BPA Thornton testified that he had attended a Department of
2    Transportation Drug Interdiction Assistant Program (DIAP) where he learned these are
3    typical characteristics of trucks used to smuggle narcotics. (RT 35-37.)

4        BPA Thornton asked Defendant for the bill of lading for his cargo. (RT 41.)
5    Defendant handed him two handwritten bills of lading. (*Id.*) BPA Thornton testified that
6    professional trucking companies use printed or computer generated bills of lading. (RT 38.)
7    He learned in his training that handwritten bills of lading could be indicative of drug
8    trafficking. (*Id.*) BPA Thornton then asked Defendant for permission to look into the back
9    of the truck. (RT 41.) Defendant consented and the truck was directed to the secondary
10   inspection area. (*Id.*) BPA Thornton estimated that only a minute to a minute and a half had
11   elapsed from the time he stopped the truck until he directed Defendant to the secondary
12   inspection area. (RT 51.)

13       On cross-examination, BPA Thornton admitted that "ghost lettering in and of itself
14   is not a certainty that the person is smuggling." (RT 48.)  He made a similar admission to the
15   presence of a high DOT number. (*Id.*) BPA Thornton also admitted that he had seen other
16   handwritten bills of lading for trucks from which drugs were not seized. (RT 51.)

17       Defendant called Mr. Cecil Lane, a consultant and testifying expert in the field of
18   truck transportation and buses. (RT 54; Ex. 100.) Mr. Lane has a wealth of experience in the
19   transportation industry, having had a career as a professional truck driver and 20 years
20   working with the Arizona Department of Public Safety, of which 17 years dealt with trucking
21   regulation enforcement. (RT 54.) Mr. Lane explained the DOT registration numbers were
22   high because they merely add numbers, instead of reusing numbers no longer used by certain
23   companies. (RT 58.) Mr. Lane testified that the DOT number for the truck driven by
24   Defendant was a legitimate number for MRM. (*Id.*)

25       Mr. Lane also explained that newer companies may not have sufficient finances to
26   have a truck professionally painted and so they paint the truck themselves.  This can result
27   in the previous marking on the truck still being visible. (RT 59.) According to Mr. Lane, this
28

frequently occurs. There are "ghost numbers on almost all used trucks, unless it's been purchased by a larger company which has the finances to completely obliterate the number and repaint it." (*Id.*)

Mr. Lane testified that larger companies use bills of lading run through processing companies, but smaller businesses do not. (RT 60.) According to Mr. Lane, the last company he had helped with an unsatisfactory DOT audit had used handwritten bills of lading. (*Id.*)

Defendant testified that he was rolling through the checkpoint at a slow speed when he noticed a border patrol agent directing him to stop. (RT 89.) According to Defendant, when the agent walked up to the driver's side he asked him where he was going and what he was hauling. (RT 91-92.) During the questioning, the agent asked for his bills of lading and Defendant gave them to him. (RT 92.) Defendant testified that after this brief questioning, the agent walked around the front of the truck and he could hear talking, but due to the traffic noise he could not understand the conversation. (RT 92-93.) The agent then returned and asked Defendant permission to "look at the back of the truck." (RT 94.) Defendant estimated the time from when he was stopped until the time he agreed to let the agents look into the back of his truck was about seven to ten minutes. (RT 93-94.) Defendant testified that he was never asked and he did not give permission to x-ray the truck. (RT 94.)

At the hearing, the parties agreed that the truck was x-rayed before a narcotics detecting dog alerted and before the truck was visually searched. However, no other evidence was offered on this point.

## II.

## **DISCUSSION**

Defendant seeks to suppress all evidence seized by government agents on three grounds: (1) the initial stop was unlawful; (2) the continued detention was unlawful; and (3) the x-ray exceeded the scope of consent to search. The government responds that the stop and detention were supported by mere suspicion, the x-ray did not exceed the scope of the consent and the search was supported by probable cause.

- 4 -

1         <u>The Stop and Detention</u>

2         A stop at a permanent immigration checkpoint constitutes a "seizure" within the meaning of the Fourth Amendment. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976). Such a stop is constitutional so long as the scope of the detention is limited to a few brief questions about immigration, the production of immigration documents, and a "visual inspection of the vehicle . . . limited to what can be seen without a search." *Id*. at 558. The government may refer any vehicle to a secondary area for further immigration inquiry "in the absence of any individualized suspicion . . . ." *Id*. at 562-63.

        Defendant does not challenge the lawfulness of the I-19 Immigration Checkpoint. Nor does Defendant assert that he could not have been stopped without individual suspicion for brief questioning about immigration. The crux of Defendant's challenge is that the initial stop and subsequent detention were not for immigration purposes, but for drugs. Defendant concludes his stop and detention were unlawful because they were not supported by a reasonable suspicion. The government responds with three alternative theories to support the stop and detention. First, both the initial stop and continued detention were justified for immigration purposes. Second, the I-19 Immigration Checkpoint was "a dual purpose checkpoint that should require no suspicion to undergird further seizure" even where the stop and detention were for drugs. (Doc. 38 at 5.) Third, if legal justification was required, that standard was mere suspicion not reasonable suspicion.

        The Court finds the testimony that the initial stop was not for immigration purposes, but for drugs, preponderated at the evidentiary hearing. BPA Kouris testified he had learned of an ICE look out for trucks suspected of smuggling drugs belonging to MRM Express. (RT 19.) According to BPAs Kouris and Thornton, traffic was being "flushed" through the checkpoint and only when BPA Kouris noticed the MRM marking did he signal BPA Thornton to stop Defendant. (RT 21.) Therefore, it is clear that, but for these markings, which were associated with drug trafficking, Defendant would have been allowed to pass through the checkpoint.

28

Turning now to what standard the government must meet to justify such a stop. "The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Martinez-Fuerte*, 428 U.S. at 554. Checkpoint stops are viewed in a "different light because the subjective intrusion the generating of concern or even fright on the part of lawful travelers is appreciably less in the case of a checkpoint stop." *Id.* at 558.

Where the traveler is stopped for an immigration inspection, the primary purpose for the checkpoint, individualized suspicion is unnecessary. *Id.* at 562. However, because the stop was made only to investigate drugs, there must be some individualized suspicion or the stop becomes an arbitrary and oppressive interference with a person's security. The body of law in this area is still developing, but in the Ninth Circuit, the government must show "an articulable suspicion or 'a minimal showing of suspicion' . . . of criminal activity." *United States v. Lewis*, No. CR 11-00540-PHX-JAT, 2011 WL 2692914 at *2 (D. Ariz. July 12, 2011) (quoting *United States v. Taylor*, 934 F.2d 218, 221 (9th Cir. 1991)). A mere or articulable suspicion is not equivalent to the reasonable suspicion standard. *See Taylor*, 934 F.2d at 221. It is a considerably lower standard. Whereas nervousness may be insufficient for a reasonable suspicion, it has been held to create an articulable suspicion and be sufficient to justify a brief detention. *Id.* Similarly, the marking on a truck believed to be associated with drug trafficking creates an articulable or mere suspicion of criminal activity.

Here, BPA Kouris recently had received information from another law enforcement agency that MGM Express was a company believed to be involved in drug smuggling. *United States v. Soto-Camacho*, 58 F.3d 408, 412 (9th Cir. 1995) (we cannot say that the stop was improper solely because general intelligence having to do with the movement of drugs was one of the reasons for the timing of activating the checkpoint). Without more, this information did not create a reasonable suspicion. Nevertheless, it justified BPA Kouris's articulable suspicion, which he contemporaneously articulated to BPA Thornton. Accordingly, the Court finds sufficient individual suspicion to stop Defendant for a brief

1 detention to investigate.

2     Having found the initial stop was lawful, the Court must now consider whether the
3 continued detention was proper. As the Court noted in *Taylor*, 934 F.2d at 220, "[b]ecause
4 of the intrusiveness inherent in extending the detention beyond the time required for
5 immigration purposes, the government must present some justification for the brief additional
6 delay." The standard for the delay "must be predicated on an articulable suspicion or 'a
7 minimal showing of suspicion.'" *Id.* at 221 (quoting *United States v. Couch*, 688 F.2d 599,
8 604 (9th Cir. 1982)); *United States v. Preciado-Robles*, 964 F.2d 882 (9th Cir. 1992) (there
9 must be a valid basis for additional intrusion and it must be of a brief duration). Thus, the
10 extended detention must be justified with articulable suspicion beyond the initial stop.

11     Here, BPA Thornton briefly spoke with BPA Kouris about the ICE lookout and
12 Thornton returned to the cab to do his inspection. (RT 21, 45). As BPA Thornton walked
13 along side of the truck he noticed the truck had a high DOT number and "ghost lettering."
14 BPA Thornton testified that he had attended DIAP classes where he learned these are typical
15 characteristics of trucks used to smuggle narcotics. (RT 35-37.) He briefly spoke to
16 Defendant, asking him his citizenship and what cargo he was carrying. (RT 40.) When BPA
17 Thornton asked Defendant for his bills of lading, Defendant handed him two handwritten
18 bills of lading. (RT 41.) BPA Thornton also found this suspicious based on his training at
19 DIAP that handwritten bills of lading are often used when drugs are being smuggled. (RT
20 38.) Mr. Lane's testimony tended to corroborate, not impeach, BPA Thornton's experience.
21 According to Mr. Lane, newer companies may have insufficient finances to professionally
22 paint a used truck and also may use handwritten bills of lading. (RT 54, 59, 60). These are
23 exactly the kinds of trucking firms BPA Thornton has learned through training and
24 experience may be involved in drug trafficking.

25     Thus, during BPA Thornton's detention of Defendant, his investigation reasonably
26 continued to arouse his suspicion. BPA Thornton then asked Defendant for permission to
27 search the truck. Defendant concedes he gave permission to look into the back of the truck.

28

1 Defendant does not challenge the further detention after he consented to the search.
2 *Martinez-Fuentes*, 428 U.S. at 567. As discussed below, he does claim the border patrol
3 agents exceeded his consent by using an x-ray machine to search the truck.

4 Accordingly, the delay at issue here is from the initial stop until Defendant consented
5 to the search. BPA Thornton estimated that only a minute to a minute and a half had elapsed
6 from the time he stopped the truck until he directed Defendant to the secondary inspection
7 area. (RT 51.) Defendant estimated the time from when he was stopped until the time he
8 agreed to let the agents look into the back of his truck as about seven to ten minutes. (RT 93-
9 94.) The Court believes BPA Thornton's time estimate was more accurate than Defendant's.
10 Prior to the stop, vehicles were being "flushed" through the checkpoint because traffic was
11 too backed up. Under the circumstances, it is unlikely the lane would remain blocked for
12 seven to ten minutes, when the truck could easily be pulled out of the traffic lane into
13 secondary. Both BPA Thornton and Defendant agree that the truck pulled to secondary after
14 he consented to the search. Nevertheless, even if Defendant's time estimate was correct, the
15 delay was not unreasonable because the border patrol's investigation continued to bear fruit
16 during that period. That is, each new discovery justified a further brief detention, until
17 Defendant consented to the search. *City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000)
18 (police may act on information they learn during a proper checkpoint stop, even where such
19 action may result in an arrest unrelated to the checkpoint's primary purpose); *Martinez-*
20 *Fuerte*, 428 U.S. at 546-47 (average delay of three to five minutes without individualized
21 suspicion held reasonable). The Court finds the stop and detention were lawful.

22 The attorney for the government urged the Court to find also that this stop and
23 detention were justified without any individual suspicion because the checkpoint's proximity
24 to the border created a dual purpose for immigration and drugs. The government offered no
25 evidence to support their assertion that the I-19 Immigration Checkpoint was a "dual purpose
26 checkpoint" and this Court declines to reach this issue because it was not adequately

27
28

- 8 -

presented for review.[2]

<u>The Consent to Search</u>

At permanent checkpoints removed from the border, border patrol officers may not search a private vehicle without consent or probable cause. *United States v. Ortiz*, 422 U.S. 891, 896–97 (1975). Consent to a search must be knowingly and voluntarily given, and must not be the product of coercion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Here, Defendant does not contest that his consent was voluntary or was not the result of coercion. (Doc. 59 at 10; RT 93.) Rather, he argues the government's agents exceeded the scope of his consent to "look into the back of the truck" by first passing the truck through an x-ray machine.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir.1994) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *accord United States v. Rodriquez-Preciado*, 399 F.3d 1118 (9th Cir. 2005). In this case, Defendant argues that a reasonable person would not have understood BPA Thornton's request to search the truck as including permission to use an x-ray to scan the truck. (Doc. 59 at 10-11.) This argument depends on whether the x-ray scan was more intrusive than a visual search. If the x-ray scan is less intrusive, conducting such an exam would not ordinarily exceed a general consent to search.

This Court finds that a reasonable person lawfully engaging in commercial trucking

---

[2] Significantly, in *Edmond*, 531 U.S. at 44, 48, the Supreme Court found that a checkpoint established for the primary purpose of interdicting drug trafficking was unconstitutional. They left open the claim that an immigration checkpoint may have a secondary purpose related to drug trafficking. WAYNE R. LAFAVE, Search and Seizure § 10.5(j), n.302 (2004). Nevertheless, the limitation on general crime-control checkpoints does not impair police officers' "ability to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose." *Edmond*, 531 U.S. at 48.

would find an x-ray scan far less intrusive than a physical search. *Cf. United States v. Henry*, 615 F.2d 1223, 1228 (9th Cir. 1980) (finding x-ray of a person less invasive than a physical search). An x-ray scan avoids the possibility that the cargo could be disturbed or damaged, which could result from a physical search. *See United States v. Okafor*, 285 F.3d 842, 845 (9th Cir. 2002) (noting that the x-ray of an object is not highly intrusive because it involves no force, no risk to the owner and does not harm the item).

Moreover, a suspect is free, after initially giving consent, to delimit or withdraw his or her consent at anytime. *See Illinois v. Rodriguez*, 497 U.S. 177, 252 (1990) ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *United States v. Ward*, 576 F.2d 243, 244 (9th Cir. 1978) ("[S]ince [appellee's] action was unilateral and contained no agreement as to duration it was implicitly limited by [appellee's] right to withdraw his consent.") (quoting *Mason v. Pulliam*, 557 F.2d 426, 429 (5th Cir. 1977)); *accord United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006). Accordingly, Defendant could have withdrawn or limited his consent, even during the search. His failure to do so indicates he consented to the entire search, including the x-ray, and everything it revealed. *United States v. Mines*, 883 F.2d 801, 804-805 (9th Cir. 1989); *United States v. Rubio*, 727 F.2d 786, 797 (9th Cir. 1983) (by allowing search "without protest" after having given at least partial consent to search, defendant "revoked" any prior qualification of the scope of consent); *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986) (defendant failed to withdraw consent).

Accordingly, the Court finds the use of an x-ray before the physical search did not exceed Defendant's consent.

### III.

### **RECOMMENDATION**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendant's Motion to Suppress. (Doc. 36.) Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections

within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR-11-0561-TUC-DCB**.

DATED this 6th day of October, 2011.

D. Thomas Ferraro
United States Magistrate Judge